UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
BRIAN COLELLA, JOSEPH BERARDI,            :    07 Civ. 6312 (LAP)
ALBERT P. SOMMA JR., ANTHONY GIORDANO,    :
MICHAEL KAZMIERZAK, DOMINICK BUETI,       :    OPINION AND ORDER
WILLIAM K. FLYNN, NICK DEMONTE,           :
JOHN FABBRICANTE, PATRICK J. BRADY,       :
JOHN SCUPELLITI, JERRY PARISI,            :
GERARD GEISLER, and ROBERT RYAN,          :
individually and on behalf of those       :
similarly situated,                       :
                                          :
                    Plaintiffs,           :
                                          :
     -against-                            :
                                          :
THE CITY OF NEW YORK and the              :
NEW YORK CITY FIRE DEPARTMENT,            :
                                          :
                    Defendants.           :
------------------------------------------x

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____          │
│ DATE FILED:___12/5/13____    │
└─────────────────────────────┘
```

LORETTA A. PRESKA, Chief United States District Judge:

        Plaintiffs brought this collective action seeking back

wages for overtime pay they claim Defendants the City of New

York (the "City") and the New York City Fire Department (the

"FDNY") withheld from them and other similarly situated

individuals in violation of the Fair Labor Standards Act of

1938, 29 U.S.C. § 201 et seq. (the "FLSA").  Defendants have

moved for summary judgment dismissing all of Plaintiffs' claims.

For the reasons stated below, Defendants' motion [Dkt. No. 61]

is GRANTED.[1]

_____

[1] The Court has considered the following submissions in deciding
the instant motion: Plaintiffs' Fourth Amended Complaint, filed
January 8, 2009 ("Compl."); Defendants' Local Rule 56.1

I.   BACKGROUND

    A.   Procedural History

        Because the caption for this case no longer accurately
reflects the Plaintiffs who remain involved in this litigation,
the Court begins with the history of the case.  On May 26, 2006,
Plaintiff Brian Colella commenced this action by filing a pro se
summons and complaint in the Supreme Court of the State of New
York, New York County, alleging that he and other employees of
the FDNY Building Maintenance Division ("BMD") were the victims
of unfair labor practices in violation of the New York Labor
Law.  Plaintiff Colella thereafter obtained counsel, who filed a
verified amended complaint on June 26, 2007, naming sixteen
additional plaintiffs and adding claims under the FLSA; all
named plaintiffs filed their written consent to join the FLSA

---

Statement of Undisputed Material Facts("Def. 56.1"); Plaintiffs'
Local Rule 56.1 Response in Opposition to Defendants' Motion for
Summary Judgment ("Pl. 56.1"); Declaration of Jessica Waters in
Support of Defendants' Motion for Summary Judgment ("Waters
Decl."); Declaration of Alison J. Chen in Support of Defendants'
Motion for Summary Judgment; Reply Declaration of Assistant
Corporation Counsel Benjamin Welikson in Further Support of
Defendants' Motion for Summary Judgment; Affidavit of Joseph
Mastropietro in Further Support of Defendants' Motion for
Summary Judgment, sworn to on February 3, 2012; Declaration of
Lawrence Solotoff in Opposition to Defendants' Motion for
Summary Judgment ("Solotoff Decl."); each of Plaintiffs'
Affidavits in Opposition to Defendants' Motion for Summary
Judgment, sworn to in October 2011 (e.g., "Berardi Aff.");
Defendants' Memorandum of Law in Support of Their Motion for
Summary Judgment; Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment ("Pl. Mem."); and
Defendants' Reply Memorandum of Law in Further Support of Their
Motion for Summary Judgment.

lawsuit, pursuant to 29 U.S.C. § 216(b).  On July 10, 2007,
Defendants removed the action to the United States District
Court for the Southern District of New York.

On January 8, 2009, Plaintiffs filed the operative
Fourth Amended Complaint (the "Complaint"), which contains
causes of action under the FLSA only; all claims under the New
York Labor Law have been abandoned.  On January 12, 2009, this
Court certified the case as a "collective action" pursuant to 29
U.S.C. § 216(b).  The notice distributed to potential additional
members of the collective action defined the class as "any and
all current and former employers of The New York City Fire
Department's Building Maintenance Division, who worked as
Carpenters, Electricians, Cement Masons, Roofers and Plumbers on
or after May 26, 2004."  On June 28, 2010, the parties filed a
stipulation adding Frederick J. Cermak and Joseph McCarthy as
additional named Plaintiffs based on their having timely opted-
in.  On December 23, 2010, the Court dismissed with prejudice
the claims of Plaintiffs John Fabbricante and Michael
Kazmierczak for failure to prosecute.

On February 17, 2011, the Court entered the parties'
stipulated dismissal with prejudice of the claims of Plaintiffs
Gerard Geisler, Nick Demonte, Dominick Bueti, and Patrick J.
Brady.  The Court granted Defendants' motion for summary
judgment as to the claims of pro se Plaintiff Anthony Giordano

on June 14, 2011, for failure to proffer evidence from which a fact finder could find that Giordano was entitled to overtime pay under the FLSA.  Accordingly, at the time Defendants filed the instant motion, the following nine named Plaintiffs remained in the case: Joseph Berardi ("Berardi"), Albert P. Somma Jr. ("Somma"), Brian Colella ("Colella"), Jerry Parisi ("Parisi"), Joseph McCarthy ("McCarthy"), Robert Ryan ("Ryan"), Frederick Cermak ("Cermak"), William K. Flynn ("Flynn"), and John Scupelliti ("Scupelliti").  Defendants now move for summary judgment on the claims of all remaining Plaintiffs.

      B.    <u>Relevant Facts</u>

        The following facts are not in dispute unless otherwise noted, and all facts are construed and all reasonable inferences are drawn in favor of Plaintiffs, the non-moving party.[2]

---

[2] Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert that fact.  Plaintiffs deny many of Defendants' Rule 56.1 facts on the sole ground that Defendants use the word "commute" to describe the time Plaintiffs spend driving their FDNY vehicles to their work locations and back home.  Since ordinary commute time is not compensable under the FLSA, Plaintiffs fear admitting these facts would sabotage their claims.  (See Pl. 56.1 ¶ 13.)  Defendants' concern is not lost on the Court.  Where Plaintiffs' only reason for denying a fact stated by Defendants is the use of "commuting" language, the Court cites either to Defendants' Rule 56.1 statement or Plaintiffs' Rule 56.1 statement to indicate that Plaintiffs do not dispute the remaining substance of Defendants' corresponding facts.

1.   Allegations in the Complaint

Plaintiffs are nine current or former BMD employees who worked at one point during the relevant period as a carpenter, electrician, or cement mason.  Plaintiffs claim Defendants failed to pay overtime for the following acts alleged to be compensable under the FLSA: (1) time spent transporting tools, materials, and equipment in their assigned FDNY vehicles from their homes to their worksites and back; (2) time spent en route to either their worksites or homes ensuring that the tools, materials, and equipment are secure in their vehicles; (3) time spent inspecting their work vehicles each morning and after they return home from work; and (4) time spent receiving or returning calls or pages from their supervisors regarding work assignments for that day or the next day.  Because Defendants employed Plaintiffs for a seven hour per day, Monday through Friday workweek, and because the seven hour workday ran from when Plaintiffs checked in at their work locations until they left for home, Plaintiffs claim the time spent performing the aforementioned tasks resulted in a greater than forty hour workweek, for which they were owed overtime at either the rate of time-and-a-half or double time.[3]  (See Compl. ¶¶ 29-30.)

_____

[3] In the Complaint, Plaintiffs claim that electricians and carpenters earn "time and a half for every hour above forty hours in the work week" whereas cement masons earn "two times the regular hourly rate at which (continued on next page)

5

Plaintiffs also bring a claim for Defendants' "intentional[] fail[ure] to maintain adequate and accurate written records for the hours and wages earned by [P]laintiffs in order to facilitate their exploitation of [P]laintiffs' labor," allegedly in violation of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2.  (Id. ¶¶ 52-53.)  Plaintiffs primarily seek relief in the form of their alleged unpaid overtime compensation under the FLSA, lost wages, pension, and retirement benefits, liquidated damages in an amount equal to their unpaid overtime compensation pursuant to 29 U.S.C. § 216(b), and reasonable attorney's fees.  (Compl. ¶¶ 56-57, 61-62.)

2.   Defendants' Representatives and Relevant Policies

Since 2002, Joseph Mastropietro ("Mastropietro") has acted as Assistant Commissioner for the Bureau of Facilities,

---

(continued from previous page) they are employed above seven hours in the day." (Compl. ¶ 41.)  Although the pay description for cement masons is the same in Plaintiffs' Rule 56.1 statement as in the Complaint, Plaintiffs admit that electricians and carpenters earn overtime at a different rate as alleged in the Complaint.  (See Pl. 56.1 ¶ 13 ("Electricians receive overtime at the rate of one and one-half (1 1/2) times their regular hourly rate for all work performed in excess of the regularly scheduled seven (7) hour work day."); id. ¶ 14 ("Carpenters receive[] overtime at the rate of one and one-half (1 1/2) times their regular hourly rate for all work performed in excess of the regularly scheduled seven (7) hour work day from Monday through Saturday, and receive two (2) times their regular rate on Sundays and Holidays.").)  Regardless, because Plaintiffs bring their claims under the FLSA, the benchmark for when they would be owed overtime pay of at least time-and-a-half their regular pay rate is a workweek longer than forty hours.  See 29 U.S.C. § 207(a)(1).

within which BMD is one department. (Pl. 56.1 ¶ 3.) Daniel
Wallen ("Wallen") has acted as Supervisor of Mechanics since at
least 2002 and reports to Mastropietro. (Id. ¶ 4.) Wallen
supervises almost all BMD trades personnel, including
Plaintiffs. (Id. ¶ 5.) Dominick Moretti ("Moretti") served as
Supervisor of Electricians from July 29, 2001, until March 31,
2009, and reported directly to Wallen. (Id. ¶¶ 6-7.)

        Electricians and carpenters are required to work
Monday through Friday, 7:30 a.m. to 3:00 p.m., with one half
hour of unpaid lunch per day, amounting to a thirty-five-hour
regular paid workweek. (Compl. ¶ 41; Def. 56.1 ¶ 12.)[4] Cement
masons similarly work thirty-five-hour regular paid workweeks,
though their days run from 8:00 a.m. to 3:30 p.m. (Pl. 56.1
¶ 15.) Electricians earn overtime at the rate of one-and-a-half
times their regular hourly rate for all work performed in excess
of the regularly scheduled seven hour workday. (Id. ¶ 13.)
Carpenters earn the same overtime rate as electricians Monday
through Saturday but earn two times their regular pay rate on
Sundays and Holidays. (Id. ¶ 14.) Cement masons earn overtime
at the rate of two times their regular hourly rate for all work
performed in excess of the regularly scheduled seven hour
workday. (Id. ¶ 16.)

---

[4] Inexplicably, Plaintiffs deny this fact in their Rule 56.1
statement while alleging it in the Complaint.

All BMD personnel, including Plaintiffs, perform their trades at various FDNY worksites, or "work locations," within the City's five boroughs and travel to their work locations using an assigned FDNY vehicle.  (Id. ¶¶ 17-18.)  During all relevant times, Plaintiffs transported tools, equipment, and supplies necessary for the performance of their jobs in their FDNY vehicles; whenever they ran low on materials they would conduct an inventory and report to 35th Street in Queens to restock.  (Id. ¶¶ 19-20.)  Although the BMD employs motor vehicle operators to transport heavy duty equipment to the work locations, Plaintiffs allege occasionally they would transport certain equipment in their FDNY vehicles that they viewed as being "heavy duty."  (Id. ¶ 21; Waters Decl. Ex. C, at 174-81.)

In April 2003, the FDNY implemented a new policy that changed the transportation procedures applicable to all BMD trade personnel.  (Def. 56.1 ¶ 22.)  Mastropietro circulated to each tradesman a memorandum (the "April 2003 Memo") and a "Driver Election Form" that contained two options.  (Id. ¶ 23; Waters Decl. Ex. I.)  "Option 1" provided that the employee would travel each day to his work location in an assigned FDNY vehicle and that such travel was non-compensable:

> I choose to use the Department vehicle from
> home and commute to my assigned work
> locations(s) on my own time using the
> Department vehicle.  Assignment(s) will be
> made the previous day as per current

8

> procedures.  Start time is 0730 and I am
> required to report to my first assigned work
> location at 0730.  I will sign out at the
> last work location at 1500.

(Pl. 56.1 ¶¶ 24-25.)  Defendants paid those employees who elected Option 1 for gas and tolls, at least within the City's five boroughs.  (E.g., id. ¶ 55; Waters Decl. Ex. S., at 54-55.) "Option 2" allowed trades personnel to commute to their work locations using their preferred mode of transportation:

> I choose to commute (i.e. drive personal
> vehicle, use mass transit, etc.) on my own
> time to my assigned work location(s).
> Assignment(s) will be made the previous day
> as per current procedures. Start time is
> 0730 and I am required to report to my first
> assigned work location at 0730.  I will sign
> out at the last assigned work location at
> 1500.

(Pl. 56.1 ¶¶ 29-30.)  Any employee who did not elect Option 1 and failed to return the executed Driver Election Form automatically defaulted to Option 2.  (Def. 56.1 ¶ 31; Waters Decl. Ex. I.)

BMD personnel who elected Option 1 were required to inspect their vehicles on a daily basis and check the vehicles' fluids at least once a week.  (Def. 56.1 ¶ 36; Waters Decl. Ex. J.)  The parties dispute whether Plaintiffs were required to inspect their vehicles during normal work hours——Defendants' contention——or before they left from home for their assigned work location——Plaintiffs' assertion.  (Def. 56.1 ¶ 37; Pl. 56.1

9

¶ 37.)  BMD personnel who elected Option 1 could not use their
FDNY vehicles for any purpose other than traveling between home
and work locations and between different work locations.  (See
id. ¶ 38.)  Defendants claim the FDNY's official policy was that
Option 1 employees were required to park their vehicles
overnight at their homes whereas Plaintiffs allege many
employees were permitted to park their vehicles at local
firehouses and other FDNY locations.  (See Pl. 56.1 ¶ 39.)

        BMD trades personnel, including Plaintiffs, were
issued pagers to enable them to communicate with their
supervisors and were required to carry the pagers at all times
during work hours; the issuance of pagers did not depend on
whether the employee elected Option 1 or Option 2.  (Id. ¶¶ 40-
41.)  Plaintiffs allege they were required to monitor their
pagers even during non-work hours.  (Id. ¶ 42.)

        On or about September 4, 2004, Defendants amended
Option 2 as follows:

> I choose to report to 58th Street (55-30
> 58th St., Maspeth) at the start of my
> workday at 0730 hrs, sign in, pick up the
> department issued vehicle, and then
> immediately proceed to my assigned job
> location(s).  Assignments will be made the
> previous day in most cases as per current
> procedures.  I will leave my last job
> assignment no sooner than 1400 hrs. and
> return to 58th Street to drop off the
> vehicle and sign out for the day.

(Waters Decl. Ex. P.)  Amended Option 2 no longer provided trades personnel the opportunity to commute to their work locations in their personal vehicles or by way of public transportation; instead, they could only commute to the central location in Maspeth (the "Maspeth Central Location") where they would pick up an FDNY vehicle and then proceed to their work locations.  (Id. Ex. C, at 231-32.)  Plaintiffs claim they were not informed in 2004 that Option 2 had been amended; some claim they first learned of it years later, while others claim they only learned of it for the first time in their depositions.  (Pl. 56.1 ¶ 44.)  Plaintiffs' claim is bolstered by the fact that certain Plaintiffs signed Driver Election Forms after September 2004 that did not reflect the amendment to Option 2.  (See Waters Decl. Exs. T, V, Z, BB, DD, FF.)

On or about February 26, 2007, the FDNY amended the language of Option 1 as follows:

> I choose to use the department vehicle from home and commute to my assigned work location(s) on my own time using the Department vehicle.  Assignment(s) will be made the previous day in most cases as per current procedures.  Start time is 0730 hrs. and I am required to report to my first assigned work location at 0730 hrs.  I will sign out at the last assigned work location at 1500 hrs. and travel home on my own time using the department vehicle.

(See, e.g., Waters Decl. Ex. R.)  This amendment to Option 1 apparently served to clarify that trades personnel who elected

Option 1 would be commuting on their own time back home from their work locations at the end of the workday, just as they would be in the morning while en route from their homes to their work locations.  Option 1 as originally drafted stated only, "I choose to use the Department vehicle <u>from home and commute to my assigned work locations(s) on my own time</u> using the Department vehicle."  (Pl. 56.1 ¶ 25 (emphasis added).)  Nevertheless, it is clear that Defendants always intended Option 1 to mean that employees would not be on the clock when driving their FDNY vehicles back home from their work locations, and Plaintiffs do not claim they read Option 1 as originally drafted any differently upon signing their original Driver Election Forms.

### 3.   Plaintiff Joseph Berardi

Berardi began working as an electrician for the FDNY in 1983.  (<u>Id.</u> ¶ 49.)  From January 3, 2003, until September 27, 2004, Berardi was not employed by the FDNY.  (<u>Id.</u> ¶ 51.)  From when he returned to work on September 27, 2004, until December 7, 2004, Berardi drove his personal vehicle between his home in Middletown, New Jersey, and his assigned work locations.  (<u>Id.</u> ¶¶ 50, 52.)  Berardi alleges Defendants retaliated against him for not electing Option 1 under the April 2003 Memo by not providing him equal overtime opportunities as his peers and sending him "to the furthest 'work assignments' from where I lived[,] [<u>viz.</u>,] the furthest-out reaches of the City of New

12

York." (Berardi Aff. ¶¶ 13-14.)  On December 8, 2004, Berardi
signed a Driver Election Form electing Option 1 and began
traveling from his home to his work locations using an FDNY van;
beginning in 2009, Berardi drove an FDNY box utility vehicle.
(Pl. 56.1 ¶ 54; Waters Decl. Ex. T.)  Berardi claims he did not
sign the Driver Election Form voluntarily, (Berardi Aff. ¶ 20),
and that his workday begins at 5:30 a.m and ends between 4:30
p.m and 5:00 p.m., depending on traffic.  (Pl. 56.1 ¶ 61.)

        Berardi argues the following actions he allegedly
conducts while driving his FDNY vehicle between his home and
work locations constitute compensable work for which Defendants
have improperly denied him pay.  First, he performs a daily 10-
15 minute inspection of his FDNY vehicle——stored overnight in
his driveway——at 5:30 a.m., which consists of checking the
tires, battery, interior lighting, and oil, and ensuring
materials inside the vehicle are secure and free from tampering.
(Pl. 56.1 ¶¶ 62-64.)  He also pulls over his vehicle once a
month to re-secure items that may have shifted during the drive.
(Pl. 56.1 ¶ 68.)  Inspecting and securing the materials at times
requires "heavy lifting." (Berardi Aff. ¶ 36.)

        Second, Berardi transports tools used in his trade,
including:  oil lubricant, battery acid, contact cleaners,
paint, certain flammable gasses, a hydraulic bender, a Chicago
bender (a "200-300 pound manual bender"), and various piping

equipment.  (Pl. 56.1 ¶¶ 69-71; Berardi Aff. ¶¶ 31, 37.)
Berardi is not required to transport all of these tools daily,
and sometimes laborers deliver the heavier equipment, such as
the benders, directly to his work locations.  (See, e.g., Pl.
56.1 ¶ 70 (admitting Berardi transported battery acid only "once
or twice a year"); Waters Decl. Ex. S, at 80-81.)

        Finally, in addition to calling his supervisor each
morning to report being on his way to his first work location,
Berardi receives calls from his supervisor or otherwise is
required to return his supervisor's calls one to three times per
week while driving between his home and work locations.  (Pl.
56.1 ¶¶ 65-66.)

                4.   Plaintiff Albert P. Somma Jr.

        Like Berardi, Somma began working as an electrician
for the FDNY in 1983.  (Pl. 56.1 ¶ 74.)  From October 25, 2004,
through February 17, 2005, Somma took a medical leave of
absence.  (Id. ¶ 76.)  He retired from the FDNY on April 1,
2006.  (Id. ¶ 78.)  During all relevant times, Somma lived in
Staten Island, New York.  (Id. ¶ 75.)  From April 30, 2003,
through October 25, 2004, Somma commuted from his home to his
assigned work locations using his personal vehicle; he did so
having defaulted to Option 2 under the April 2003 Memo by
refusing to sign the Driver Election Form.  (Id. ¶¶ 79-80.)

On February 18, 2005, when he returned from his
medical leave, Somma signed the Driver Election Form electing
Option 1 and began driving an FDNY box utility vehicle to his
assigned work locations each day until his retirement. (Id.
¶ 81; Waters Decl. Ex. V.) Somma alleges he signed the form
involuntarily——he claims he was forced to elect Option 1 because
otherwise he would not receive equal overtime opportunities and
would be assigned to "distant" work locations as "punishment."
(Id. ¶¶ 81, 87, 89-90; Somma Aff. ¶ 7.) He further alleges
that, with Moretti's consent, he parked his FDNY vehicle each
night at a local firehouse instead of his home; Somma commuted
to the firehouse each workday to pick up his FDNY vehicle. (Id.
¶¶ 83-85.) Somma claims he was only compensated for gas and
tolls once he began driving his FDNY vehicle; he was not
reimbursed for these expenses for the time spent driving his
personal vehicle between home and the local firehouse. (Id.)

Somma claims to have performed a daily inspection of
his FDNY vehicle similar to the one Berardi allegedly performed,
with the added responsibility of occasionally washing the truck.
(Waters Decl. Ex. U, at 109-10.) Each inspection lasted a
"[h]alf hour or more." (Id. Ex. U, at 110; Pl. 56.1 ¶ 92.)
Somma transported similar chemicals and "heavy duty" equipment
as Berardi, including, inter alia, propane and portable
generators. (See Pl. 56.1 ¶¶ 98-99.) Somma alleges having

15

pulled over his FDNY vehicle while traveling between work locations and his local firehouse to secure items that shifted during the drive; this occurred anywhere from "[m]aybe [a] couple of times" to "many times." (Waters Decl. Ex. U, at 111.) Finally, Somma claims to have received and answered pages from his supervisors while driving his FDNY vehicle; these types of communications occurred "every day [or] . . . a few times a week." (Pl. 56.1 ¶¶ 94-95.)  On average, Somma parked and secured his FDNY vehicle at his local firehouse each evening between 4:30 p.m. and 5:00 p.m.  (Id. ¶ 103.)

    5.   Plaintiff Brian Colella

    Colella began working as an electrician for the FDNY in 1988 and lived at all relevant times in Staten Island, New York.  (Pl. 56.1 ¶¶ 105-06.)  He was wrongfully terminated in June 2003 but reinstated on March 5, 2007.  (Waters Decl. Ex. W, at 13.)  When presented with the April 2003 Memo, Collela refused to sign the Driver Election Form and thus defaulted to Option 2; thereafter until his wrongful termination Colella commuted to and from his work locations using his personal vehicle.  (See Pl. 56.1 ¶ 109.)

    Upon being reinstated, Colella signed the Driver Election Form and elected Option 1 "under protest" and began driving an FDNY van to his work locations.  (See id. ¶ 110; Waters Decl. Ex. R.)  Colella claims he was permitted to store

16

his FDNY vehicle at Engine 161, a local firehouse on Staten
Island.  (Pl. 56.1 ¶ 110.)  Collela cites the promise of more
overtime and fear of otherwise being assigned distant work
locations as reasons for selecting Option 1.  (See Waters Decl.
Ex. W, at 36 ("There were talks when I came back that guys who
[elected Option 1] would make——actually, we were promised up to
$40,000 or more in overtime by [Wallen]."); id. entered his FDNY
vehicle between 5:30 a.m. and 6:00 a.m. and returned home
between 4:00 p.m. and 6:00 p.m.[5]  (Waters Decl. Ex. W, at 47,
74.)

On August 14, 2008, Colella signed a new Driver
Election Form and elected Option 2 "under protest" and began
commuting each day to the Maspeth Central Location, where he
picked up an FDNY-issued vehicle before proceeding to his
assigned work location.  (See Waters Decl. Ex. W, at 80-81; id.
Ex. X.)  Collela claims he switched to Option 2 because he still
was not receiving as much overtime as his peers, he still was
being assigned distant work locations, and he had concerns about
tax implications stemming from the City's paying for gas and
tolls.  (Pl. 56.1 ¶ 117; Waters Decl. Ex. W, at 81.)

---

[5] Plaintiffs deny that Colella returned home between 4:00 p.m.
and 6:00 p.m. and instead allege that he returned to Engine 161
during these hours.  (Pl. 56.1 ¶ 120.)  The Court views this
objection as meritless given Colella's own testimony on the
issue, (Waters Decl. Ex. W, at 74), and the fact that Colella's
home was less than a five-minute drive from Engine 161, (id. at
48).

Colella claims the following activities, which are nearly identical in scope to those allegedly performed by Berardi and Somma, constitute compensable work for which Defendants denied him overtime.  Each work morning Colella performed a ten minute inspection of his FDNY vehicle.  (Pl. 56.1 ¶¶ 121-22.)  He then took five minutes to perform required paperwork, which consists of recording the mileage and time upon entering the vehicle.  (Id. ¶¶ 123-24.)  Colella spoke to his supervisor for five minutes each work morning either over the phone prior to driving his FDNY vehicle or via a dedicated radio channel once inside the vehicle and en route to his assigned work location.  (Waters Decl. Ex. W, at 52-54.)  In addition, approximately twelve times a year Colella pulled over his FDNY vehicle to return work pages; these conversations lasted five minutes.  (Id. Ex. W, at 54-55.)

In the course of driving to and from his assigned work locations, Colella stopped approximately twelve times a year to re-secure items in his vehicle; this added ten minutes to his workday when it occurs.  (Pl. 56.1 ¶¶ 127-28.)  Colella transported similar tools and heavy duty equipment as Berardi and Somma, including, inter alia, bleach, "A to Z hardware," fire extinguishers, and ladders.  (Waters Decl. Ex. W, at 58-61.)  The tools and equipment, which Colella alleges Moretti

forced him to transport, (Pl. 56.1 ¶ 131), remained in Colella's
FDNY vehicle overnight, (id. ¶ 132).

      6.   <u>Plaintiff Jerry Parisi</u>

      Parisi began working as a carpenter for the FDNY in
1988 and retired in December 2007. (Pl. 56.1 ¶¶ 134, 136.) He
lived in Staten Island, New York, until approximately January
2007 when he moved to Middletown, New Jersey, where he currently
resides. (<u>Id.</u> ¶ 135.) From April 2003 until September 2004,
Parisi commuted from his home in Staten Island to his assigned
work locations using his personal vehicle. (<u>Id.</u> ¶ 137.)

      Beginning in September, Parisi reported to the Maspeth
Central Location, where he picked up an FDNY-issued utility
vehicle and then proceeded to his first work location. (Pl.
56.1 ¶ 138; Waters Decl. Ex. Y, at 85-86.) On July 29, 2005,
Parisi signed a Driver Election Form electing Option 1 and began
traveling from his home to his work locations using an assigned
FDNY van. (Waters Decl. Ex. Z; <u>id.</u> Ex. Y, at 30-32, 36-37.)
Parisi claims he was forced into electing Option 1 and was not
informed that reporting to the Maspeth Central Location was
still an option; indeed, the Driver Election Form Parisi signed
does not reflect the September 2004 amendment to Option 2. (Pl.
56.1 ¶ 139; Waters Decl. Ex. Z.) Parisi felt that he had to
choose Option 1 in order to receive an equivalent amount of
overtime as his peers. (Pl. 56.1 ¶ 144; Waters Decl. Ex. Y, at

32-33.)  The FDNY paid for the costs of tolls and gas associated
with Parisi's trips between his work locations and home.  (Pl.
56.1 ¶¶ 142-43; Waters Decl. Ex. Y, at 44-45.)

Parisi performed a daily 10-15 minute inspection of
his assigned FDNY van, which consisted of checking the doors and
mirrors and ensuring all items were "secured inside the van as
best as possible."  (Pl. 56.1 ¶¶ 148-49.)  While driving the van
between his home and work locations Parisi answered pages one or
two times per month and stopped to secure items five to ten
times per year (each time taking between five and twenty
minutes).  (Id. ¶¶ 150-53.)  Parisi transported chemicals in his
van, including MAPP gas, propane, gasoline, lacquer thinners,
mercury, ammonia, and gun powder for a nail gun.  (Id. ¶ 154.)
He also transported the following "heavy duty" tools and
machines, which remained in his van overnight: a hammer, drills,
saws, and, once or twice a year, a generator.  (Id. ¶¶ 155-57.)

7.  Plaintiff Joseph McCarthy

McCarthy began working as a carpenter for the FDNY in
1997 and lived in Queens, New York.  (Id. ¶¶ 159-60.)  As of
September 2004, McCarthy drove to the Maspeth Central Location
using his personal vehicle where he picked up an FDNY vehicle by
7:30 a.m., traveled to his assigned work location, and then
returned to the Maspeth Central Location by 3:00 p.m.  (Id. ¶¶
163-64.)  Although he had received Driver Election Forms in the

past, until August 2005 he did not sign them on the advice of
his union.  (Id. ¶ 62.)  On August 15, 2005, however, in
response to perceived hostility and in order to receive
overtime, McCarthy alleges he involuntarily signed a Driver
Election Form electing Option 1[6] and began traveling to his work
locations in an assigned FDNY Ford F-350.  (Waters Decl. Ex. BB;
id. Ex. AA, at 31-32, 46; Pl. 56.1 ¶ 161.)  McCarthy alleges his
supervisor permitted him to park his FDNY vehicle at Jacobi
Hospital in Bronx, New York; accordingly, he drove his personal
vehicle between his home and Jacobi Hospital before picking up
and after dropping off his FDNY vehicle each work day.  (Pl.
56.1 ¶¶ 169-70.)

Each morning McCarthy performed the following
inspection of his assigned FDNY vehicle:

> I walk around, I look at it.  I open the
> cab, make sure there is nothing loose in the
> back of it.  I have to secure down anything
> that might have been loose.  I do look under
> my truck to make sure nobody has tampered
> with it. . . .  I have to check to make sure
> my mirrors are correct.  People push them in
> at times . . . .  I will check the oil, make
> sure the fuel, if it's in there, if it's not
> full, I'm required to keep it full, the
> windshield wiper fluid.  We are not allowed
> to keep it empty.  It has to be fueled in
> case of an emergency.

---

[6] McCarthy further alleges he was forced to sign Option 1 because
at times the proper tools were not delivered to his work
locations.  (Pl. 56.1 ¶¶ 165-66; Waters Decl. Ex. AA, at 44-45.)

(Waters Decl. Ex. AA, at 47, 106-07.)  He transported generally the same tools and equipment as the other Plaintiffs, including table and chop saws, power drills, nail guns, a compressor, ladders, flammable gas cans, scaffolding, cement, lumber, and Plexiglas.  (Id. Ex. AA, at 57.)  Occasionally while driving his FDNY vehicle McCarthy stopped and spent 5-10 minutes securing items in the back.  (Id. Ex. AA, at 61-62.)  Approximately 3-4 times per year, when he arrived at a work location before 7:30 a.m., McCarthy tended to his vehicle by fixing cabinets or tightening shelving.  (Pl. 56.1 ¶ 188.)  In addition, while driving to his work locations he called his supervisors "probably daily," and the calls lasted on average five minutes; it was also common for McCarthy to spend 3-5 minutes answering phone calls from his supervisors upon leaving his work locations at the end of the day.  (Id. ¶¶ 176-79.)

8.   Plaintiff Robert Ryan

Ryan worked for the FDNY as a cement mason from 1999 until his retirement in July 2008.  (Id. ¶ 190.)  In 2004, Ryan commuted from his home in Staten Island, New York, to the Maspeth Central Location, where he picked up and dropped off his assigned FDNY vehicle.  (Id. ¶ 194.)  On August 11, 2005, Ryan signed a Driver Election Form electing Option 1.  (Waters Decl. Ex. DD.)  Ryan claims he was forced into choosing Option 1 because he had responsibilities taken away for not doing so, was

22

assigned to work locations far from his home as a form of
retaliation, and was promised $30,000 in overtime pay if he did
choose Option 1.  (Waters Decl. Ex. CC, at 24-26; Pl. 56.1 ¶
209.)

Ryan drove between his home and work locations in an
assigned FDNY utility truck and occasionally picked up a "cherry
picker" vehicle from a central location; however, beginning in
August 2007 and continuing until his retirement from the FDNY in
July 2008, Ryan reverted to commuting from his home to the
Maspeth Central Location, where he stored his FDNY utility
truck.  (Waters Decl. Ex. CC, at 41-45.)  The FDNY paid for
tolls and gas charges incurred when Ryan drove his assigned
utility truck.  (Id. Ex. CC, at 51.) Ryan performed a ten-minute
morning inspection of his FDNY vehicle daily, which consisted of
walking around the truck "to make sure it was secured" and
"check[ing] all the locks [to see] if they were tampered with."
(Id. Ex. CC, at 46-48.)  Approximately two times per week for
fifteen minutes Ryan pulled his truck over to secure items that
may have shifted.  (Id. Ex. CC, at 59; Pl. 56.1 ¶ 215.)

Ryan transported in his utility truck, inter alia, a
five gallon tank of gasoline, muriatic acid, cement, bags of
stone and sand, and hand tools.  (Pl. 56.1 ¶¶ 216, 218.)  He
believes driving the truck was "work in itself" because it took
"great effort to drive."  (Id. ¶ 222.)  He was not responsible

23

for the maintenance of the truck, however, as mechanics performed that function. (Id. ¶ 217.)  Finally, "every so often" on a weekly basis Ryan was required to answer phone calls from his supervisors while driving his truck, with each conversation lasting "a couple minutes." (Waters Decl. Ex. CC, at 49-50.)

### 9. Plaintiff Frederick Cermak

Cermak, who lived at all relevant times in Brooklyn, New York, began working for the FDNY as a maintenance worker on February 1, 1999, was provisionally appointed to the title of carpenter on January 31, 2005, and was permanently appointed as carpenter on March 23, 2009. (Pl. 56.1 ¶¶ 223-26.)  When he was a maintenance worker Cermak drove to the Maspeth Central Location to pick up an FDNY truck and then proceeded to his work locations. (See Waters Decl. Ex. EE, at 18-19.)  However, in order to be promoted provisionally to the role of carpenter, Cermak claims Wallen forced him to begin driving an FDNY vehicle between his home and work locations on February 5, 2005. (Id. Ex. EE, at 18-20, 25.)  On August 31, 2005, Cermak signed a Driver Election Form electing Option 1; the form did not reflect the September 2004 amendment to Option 2. (Id. Ex. FF.)  Cermak claims further that he was forced to elect Option 1 in order to receive sufficient overtime. (Id. Ex. EE, at 28.)  Cermak was assigned a box utility truck. (Id. Ex. EE, at 33-34.)

Before entering his truck each work morning, Cermak visually inspected the vehicle for 4-5 minutes by making sure the doors were locked and that the vehicle had not been tampered with overnight. (Pl. 56.1 ¶¶ 233-34.) He performed a similar inspection at his work locations before entering his vehicle and driving home. (Id. ¶ 235.) Although generally he received his next day's work location by calling his supervisors before 3:00 p.m. the day before, on occasion he learned of changes to his assignments by receiving calls from his supervisors either in the morning while en route to his originally scheduled location or after his regularly scheduled work day concluded at 3:00 p.m. (Id. ¶¶ 236-38.) His supervisors called him after 3:00 p.m. "maybe twice a month," and the calls he received in the morning——which forced him to pull over his vehicle——lasted for 5-10 minutes. (Id. ¶¶ 238-39.) The FDNY paid for tolls and gas charges Cermak incurred while driving his FDNY truck between his home and work locations. (Id. ¶ 240.)

Cermak transported the following equipment and materials in his box utility truck: a welding machine (at times), oxyacetylene (at times), propane, gasoline, and starting fluid, oil, and fuel stabilizer for the welding machine. (Id. ¶¶ 244-46.) Half a dozen times a year Cermak was required to pull over his vehicle to re-secure the items he transported, which lasted between five and fifteen minutes. (Id. ¶ 243.)

25

Cermak believes he should be compensated for operating the truck because "[i]t is not like you are in a little Toyota driving. It is work.  Physically, mentally, it is demanding.  You have to be alert."  (Id. ¶ 253.)

On October 21, 2010, Cermak requested permission to park his FDNY-issued truck at a local firehouse due to complaints and threats he was receiving from his neighbors. Cermak claims that once Wallen learned his vehicle had been vandalized with graffiti, Wallen told him he could park his vehicle at his local firehouse, just as Wallen had allegedly permitted other FDNY employees to do.  (Id. ¶ 248; Waters Decl. Ex. Q.)  However, Cermak's request was denied by his supervisor in a letter dated October 27, 2010.  (Waters Decl. Ex. Q.)  In the letter, Cermak's supervisor reminded him that the alternative to parking his vehicle at home each night was to store his vehicle at the Maspeth Central Location, and if Cermak believed he could no longer park his vehicle safely at home, Cermak's supervisor recommended that he switch to Option 2. (Id.)  Accordingly, on October 28, 2010, Cermak signed a new Driver Election Form and elected Option 2.  (Id. Ex. GG.)


10.  Plaintiff William K. Flynn

Flynn was appointed as a carpenter for the FDNY in April 1999.  (Pl. 56.1 ¶ 254.)  At all relevant times he lived

26

in Staten Island, New York.  (Id. ¶ 255.)  From 2003 until March
20, 2006, Flynn used his personal vehicle to commute from home
to the Maspeth Central Location, where he picked up his assigned
FDNY vehicle.  (Id. ¶ 256.)  On March 30, 2006, Flynn signed a
Driver Election Form electing Option 1 and began traveling
between home and his work locations in an assigned FDNY box
utility truck.  (Waters Decl. Ex. II; id. Ex. HH, at 50-51.)
Flynn says he was compelled to choose Option 1 because he was
not getting the same opportunities for overtime as his peers who
drove between their homes and work locations in FDNY vehicles
and because he was not getting the "sweet job locations" close
to his home; instead, he was given job assignments that would
"make things a little more difficult for him.  (Waters Decl. Ex.
HH, at 34-36; Pl. 56.1 ¶ 261.)

         Each morning Flynn conducted the same type of visual
inspection of his truck as the other Plaintiffs, which includes
"initiat[ing] the lighting," "kick[ing] the tires," and
"popp[ing] the hood."  (Waters Decl. Ex. HH, at 47-48.)  The
morning inspection "could entail fifteen minutes."  (Pl. 56.1
¶ 265.)  Flynn also performed a shorter inspection at the end of
the day, which lasted 5-10 minutes.  (Id. ¶¶ 266-67.)  Twice a
year, Flynn has to stop for 10-20 minutes to re-secure items
that shift during the drive.  (Id. ¶¶ 268-69.)  Those items are
similar to those transported by the other Plaintiffs, including

gasoline (once a month), MAPP gas, thinners, lubricants, drills, saws, sanding machines, compressors, and staple, brag, and framing guns.  (Id. ¶¶ 275-76.)

Flynn generally called his foreman at 2:00 p.m. each day to learn of his next day's assignment.  (Pl. 56.1 ¶ 258.) Approximately fifteen times per year he pulled over his truck to answer a page from his supervisor.  (Waters Decl. Ex. HH, at 53-55.)  It took up to a half hour to reach a firehouse to respond to a page, and the ensuing conversation on average could lasted up to another half hour.  (Pl. 56.1 ¶ 274.)  The FDNY paid for gas and toll charges associated with Flynn's truck.  (Id. ¶ 259.)

### 11.  Plaintiff John Scupelliti

Scupelliti became a carpenter for the FDNY on March 28, 1988, and retired in January 2010.  (Id. ¶¶ 280, 284.) Until June 2003 he lived in Brooklyn, New York; thereafter, he lived in Staten Island, New York.  (Id. ¶ 281.)  From September 2004 until March 30, 2006, Scupelliti commuted to the Maspeth Central Location using his personal vehicle.  (Id. ¶ 282.)  On March 30, 2006, he signed a Driver Election Form electing Option 1 and began driving an FDNY box utility truck between his home and work locations.  (Waters Decl. Ex. KK; id. Ex. JJ, at 48.) Scupelliti claims he was forced to choose Option 1 or else he would not receive the same overtime opportunities and desirable

work locations as those who did sign for Option 2 and he would be at risk of "being written up more." (Id. Ex. JJ, at 30-34.) Soon after electing Option 1, however, his truck was vandalized, and Scupelliti thereafter parked it at the Staten Island Communication Office. (Pl. 56.1 ¶ 284.)

The FDNY paid for all gas and toll charges Scupelliti incurred while using the truck. (Waters Decl. Ex. JJ, at 53.) He learned of his next day's work location from his foreman either before leaving for the day or while driving his truck back to Staten Island; sometimes he was paged about a changed work location while driving in the morning. (Pl. 56.1 ¶¶ 292, 295.) Other than being notified about work assignments, Scupelliti was paged while driving home only in emergency situations; he was paged on average 20-30 times per year while driving home. (Id. ¶¶ 293-94.) The conversations returning the pages lasted 2-5 minutes. (Id. ¶ 296.)

Scupelliti's daily vehicle inspections lasted anywhere from 5-40 minutes. (Id. ¶ 298.) He pulled his truck over to re-secure items that shifted while driving whenever he a heard a noise from the back of the vehicle that "didn't sound right." (Id. ¶ 301.) The roadside stops lasted 2-15 minutes. (Waters Decl. Ex. JJ, at 60.) Scupelliti transported similar items as those transported by the other Plaintiffs, including Plaster of Paris, compressors, butane, saws, sawhorses, and Sawzalls. (Id.

¶ 303.)  According to Scupelliti, his FDNY truck was "a very difficult vehicle to drive."  (Waters Decl. Ex. JJ, at 122.)

II.  DISCUSSION

        Defendants move for summary judgment on Plaintiffs' claims based on the following grounds: (1) those claims that accrued more than two years before Plaintiffs consented to join this action are barred by the statute of limitations; (2) Plaintiffs' time spent driving their equipment-filled FDNY utility vehicles from home to their work locations and back constitutes non-compensable commuting under the FLSA; (3) Plaintiffs' time spent conducting inventory and safety inspections of their FDNY vehicles, stopping to re-secure equipment while en route to their work locations or back home, and receiving calls from their supervisors regarding emergencies or their next day's assignment reflects preliminary, postliminary, or de minimis activities not recognized as compensable work under the FLSA; and (4) because Plaintiffs have failed to prove that they performed compensable work under the FLSA for which they were not paid, there can be no violation of 29 U.S.C. § 211(c) because Defendants were not required to maintain records of Plaintiffs' non-compensable activities such as commuting.

        A.  Summary Judgment Standard

Summary judgment is appropriate only when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The substantive law governing the suit identifies the essential elements of the claims asserted and therefore indicates which facts are material. Anderson, 477 U.S. at 255-56. The moving-party bears the initial burden of demonstrating the absence of a genuine dispute of fact on each material element of the claims asserted. See Celotex, 477 U.S. at 323; see also FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994). If the moving party carries its burden, the burden then shifts to the non-movant to present evidence sufficient to satisfy every element of the claim. Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Celotex, 477 U.S. at 323-24). Mere allegations or denials from the pleadings are insufficient to defeat summary judgment; instead, the non-moving party must point to specific facts establishing that a genuine issue for trial exists. See Anderson, 477 U.S. at 256. The court must grant summary judgment "if, under the

governing law, there can be but one reasonable conclusion as to the verdict." Id. at 250.

To determine whether a genuine dispute of material fact exists, a court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Lucente v. IBM Corp., 310 F.3d 243, 253 (2d Cir. 2002). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

B.   Analysis

1.   Only Some of Plaintiffs' Claims Are Timely

An action under the FLSA has a two-year statute of limitations, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C.A. § 255(a).  Collective actions under the FLSA have special requirements for determining when each individual plaintiff shall be deemed to have commenced his or her action:

> [A] collective or class action instituted under the [FLSA] . . . shall be considered to be commenced in the case of any individual claimant—
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
> (b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C.A. § 256; see also Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 260 (S.D.N.Y. 1997) ("[O]nly by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled.").  As is relevant here, a cause of action under the FLSA accrues "when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends."  29 CFR § 790.21(b).

Here, excluding Colella, Cermak, and McCarthy, this action is deemed to have been commenced on behalf of all

33

Plaintiffs on June 26, 2007, when they opted-in and filed an amended complaint.  Colella filed a pro se complaint on May 26, 2006, which, construed liberally, may be deemed to assert a claim under the FLSA.  (See Waters Decl. LL.)  For Cermak, this action was commenced on March 8, 2009, when he opted-in following receipt of the class notice; for McCarthy, it was commenced upon his opting-in on March 27, 2009.[7]  [See Dkt. No. 33.]  Plaintiffs do not argue for equitable tolling but insist that the three year statute of limitations applies because Defendants acted willfully in violating the FLSA.  The Court disagrees.

Plaintiffs bear the burden of proof on the issue of willfulness.  Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009).  "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act."  Id. (quoting

---

[7] Just because this Court certified the collective action class as all carpenters, electricians, cement masons, roofers, and plumbers who worked for the BMD on or after May 26, 2004, does not mean all of Plaintiffs' claims accruing after that date are timely.  The statute of limitations question is an independent hurdle that must be cleared.  See, e.g., Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F. Supp. 2d 445, 449-50 (S.D.N.Y. 2011) (permitting notice of FLSA collective action to be effectuated upon a large class of plaintiffs but reserving determination as to the timeliness of each plaintiff's claims).  Indeed, the notice to potential class members in this case warned that "claims under the Fair Labor Standards Act must be brought within 2 years of the date the claim accrues, unless the employer's violation of the law was 'willful,' in which case the claim must be brought within 3 years."  [Dkt. No. 12.]

<u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988)).
Plaintiffs claim Defendants acted willfully because they
allegedly violated a New York City Mayoral Executive Order,
failed to seek an advisory opinion from the New York City Office
of Labor Relations as to the legality of the Driver Election
Forms, and failed to provide certain Plaintiffs with the correct
Driver Election Form.  None of these arguments, however, serves
to satisfy Plaintiffs' burden.

        First, Plaintiffs allege that the changes to
Defendants' transportation policy for BMD trade personnel——first
reflected in the April 2003 Memo——violated the mandate of
Executive Order No. 83 (1973) that "[t]he City Director of Labor
Relations shall have the exclusive authority to negotiate on all
matters within the scope of collective bargaining." (Solotoff
Decl. Ex. H.)  Accepting that allegation as true, Plaintiffs
fail to explain the connection between a violation of city
collective bargaining procedures and a willful violation of the
FLSA.  Even an employer's action that comports with the FLSA
could violate some provision of state law, but that does not
turn the action into a violation of the FLSA, let alone a
willful one.

        Plaintiffs' second argument——that "Defendants failed
to produce a legal opinion for the Office of Labor Relations
that their scheme was legal," (Pl. Mem. at 25)——similarly fails

35

to prove willfulness.  The Supreme Court has rejected making the question of willfulness "turn on whether the employee sought legal advice" because that would "permit a finding of willfulness to be based on nothing more than negligence." McLaughlin, 486 U.S. at 134-35.  That Defendants did not seek an advisory opinion from the Office of Labor Relations prior to issuing the April 2003 Memo does not prove Defendants had knowledge of or reckless disregard for violating the FLSA.

Finally, that certain Plaintiffs were provided with versions of the Driver Election Form that did not reflect the September 2004 amendment to Option 2 is irrelevant to the willfulness analysis.  At most it may provide grounds for filing a grievance, but that does not speak to whether Defendants had in mind that they were (or likely could have been) violating the FLSA by changing their transportation policy.  Accordingly, because Plaintiffs have failed to produce evidence of willfulness, the two year statute of limitations applies.

Based on the applicable two year statute of limitations, claims by Plaintiffs Berardi, Somma, Parisi, Ryan, Flynn, and Scupelliti for alleged unpaid overtime that accrued prior to June 26, 2005, are time-barred.  Similarly, all such claims by Plaintiffs Colella, Cermak, and McCarthy that accrued prior to May 26, 2004, March 8, 2007, and March 27, 2007, respectively, are time-barred.  The Court thus grants in part

Defendants' motion on this ground.  In any event, the Court finds that Plaintiffs' claims——whether time-barred or timely—— are not compensable under the FLSA.

> 2.  <u>Plaintiffs' Travel Between Their Homes and Work Locations Constitutes Non-Compensable Commute Time Under the FLSA</u>

Plaintiffs' primary claim is that Defendants improperly denied them overtime pay for their time spent transporting necessary work equipment in FDNY-issued vehicles between their homes and assigned work locations.  In opposition to the instant motion, Plaintiffs claim Defendants treated this travel activity as compensable work prior to issuance of the April 2003 Memo, that Defendants may not rely upon the executed Driver Election Forms because Plaintiffs did not sign them voluntarily, and that transporting their work equipment in the FDNY's utility vehicles is a principal job responsibility for which they were hired such that it does not fall within the FLSA's commuting exemption.  Because the Court finds Congress expressly exempted from the FLSA's reach Plaintiffs' commuting activities when it enacted the Portal-to-Portal Act of 1947 (the "PPA") and the Employer Commuter Flexibility Act of 1996 (the "ECFA"), both codified at 29 U.S.C. § 254, Plaintiffs fail to state a claim for relief under the FLSA.

Plaintiffs bring their FLSA claim under 29 U.S.C. § 207(a)(1), which requires covered employers to pay their

workers at least time-and-a-half their regular pay rate for any workweek longer than forty hours.  While the FLSA was enacted "to ensure that employees receive a 'fair day's pay for a fair day's work[,]' . . . not all work-related activities constitute 'work or employment' that must be compensated." Gorman v. Consol. Edison Corp., 488 F.3d 586, 589-90 (2d Cir. 2007) (citations omitted).  Congress passed both the PPA and the ECFA to grant employers relief from owing workers compensation for certain activities.  As codified, this dual legislation now provides:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee . . . overtime compensation[] for or on account of any of the following activities of such employee . . . --
>
>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such

38

> vehicle for commuting shall not be
> considered part of the employee's principal
> activities if the use of such vehicle for
> travel is within the normal commuting area
> for the employer's business or establishment
> and the use of the employer's vehicle is
> subject to an agreement on the part of the
> employer and the employee or representative
> of such employee.

29 U.S.C. § 254(a).

With respect to subsections (1) and (2)——which reflect the text of the PPA——"the FLSA regulations define 'principal activities' as those 'which the employee is employed to perform.'" Gorman, 488 F.3d at 590 (quoting 29 C.F.R. § 790.8(a)). "[A]ctivities [that] are an integral and indispensable part of the principal activities for which covered workmen are employed" are compensable under the PPA even if performed outside of the employee's regular work shift. Steiner v. Mitchell, 350 U.S. 247, 256 (1956); see also Gorman, 488 F.3d at 590-91. However, the PPA's amendments to the FLSA clearly exempt employers from "responsibility for commuting time and for relatively trivial, non-onerous aspects of preliminary preparation, maintenance and clean-up." Reich v. N.Y. City Transit Auth., 45 F.3d 646, 651 (2d Cir. 1995).

The ECFA's amendments to the PPA grant employers an even more explicit exemption from compensating workers for their commute time. "The ECFA's language states that where the use of the vehicle is subject to an agreement on the part of the

employer and the employee, [and the use of such vehicle for travel is within the normal commuting area for the employer's business,] it is not part of the employee's principal activities and thus not compensable." Rutti v. Lojack Corp., Inc., 596 F.3d 1046, 1052 (9th Cir. 2010) (internal quotation marks omitted).

Plaintiffs' claim that transporting work equipment in their FDNY-issued utility vehicles to their work locations represents a principal activity for which Defendants employed them to perform must fail.  First, Plaintiffs are tradesmen—carpenters, electricians, and cement masons—not truck drivers. Although surely Plaintiffs require the tools transported in their vehicles in order to perform their trades and Plaintiffs may be required to drive in order to perform their essential job functions, transporting equipment is not "integral" to being a tradesman. See, e.g., IBP, Inc. v. Alvarez, 546 U.S. 21, 40–41 (2005) ("[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under Steiner.").

Second, and more to the point, Plaintiffs' use of the FDNY's vehicles to travel from their homes to their work locations falls squarely within the ECFA's ambit.  Plaintiffs used the vehicles to travel to the five boroughs of New York

40

City, i.e., the normal commuting area for the FDNY's business.
And the use of the vehicles was subject to an agreement——the
Driver Election Form——signed by each Plaintiff.  Cf. Burton v.
Hillsborough Cnty., 181 F. App'x 829, 836 (11th Cir. 2006)
(finding travel time in employer's vehicles was compensable and
not exempt under the ECFA because plaintiffs' claims did not
involve "home-to-work travel" but rather the type of travel
provided for in amended Option 2 in the Driver Election Form,
i.e., travel from employer's designated vehicle pick-up location
to worksites).

Although Plaintiffs do not dispute that they traveled
within the FDNY's normal commuting area, they make much of the
fact that they were forced into signing the Driver Election
Form, and thus argue that no valid agreement existed.
Plaintiffs allege the coercion consisted of:  promising large
amounts of overtime opportunities for whomever elected Option 1;
threatening little or no overtime opportunities for whomever
elected Option 2; assigning those individuals who elected Option
2 to undesirable work locations; and generally creating a
hostile environment for whoever refused to drive their vehicles
between their homes and work locations.  The problem with
Plaintiffs' argument is that there is no requirement in the text
of the ECFA that the agreement be entered into voluntarily by
the employee.  Indeed, the legislative history reveals that

Congress rejected a version of the bill that would have included a requirement that the employee sign a "knowing and voluntary" agreement in order for the commuting exemption to apply.  <u>See</u> H.R. Rep. No. 104-585, at 10-11 (1996).  "The 'agreement' required by ECFA may [even] be a condition of the employee's employment."  <u>Rutti v. Lojack</u>, 596 F.3d 1046, 1051-52 (9th Cir. 2010).

Here, Plaintiffs do not assert that commuting to their work locations in assigned FDNY vehicles was an outright condition of their employment.  They do assert, however, that despite the two apparent options on the Driver Election Form, there really was no choice: in order to receive equal overtime and treatment as their peers, Plaintiffs allege they had no choice but to elect Option 1.[8]  In essence, Plaintiffs allege that choosing Option 1 was a de facto condition of their

---

[8] The Court further notes that Plaintiffs have not directed the Court's attention to any authority——and the Court is aware of none——that guarantees Plaintiffs a certain amount of overtime. If an employer may condition its employees' entire employment on commuting using a company vehicle, the Court sees no obstacle to an employer's conditioning opportunities for overtime on the same.  <u>Cf.</u> <u>Adams v. N.Y. State Educ. Dep't</u>, 752 F.Supp.2d 420, 454 ("'[E]very court in this circuit that has considered the issue of whether there exists a constitutionally protected property interest in overtime pay has answered in the negative.'" (quoting <u>Cassidy v. Scoppetta</u>, 365 F. Supp. 2d 283, 287 (E.D.N.Y. 2005))).

employment.[9]   But the text of the ECFA, the legislative history,
and persuasive case law all indicate that Plaintiffs' signed
Driver Election Forms were no less enforceable under the ECFA
merely because Plaintiffs may have been pressured to sign them.
And any allegation of threatened or actual retaliation for not
choosing Option 1, while in theory may give rise to a different
cause of action, does not save Plaintiffs' claims under the FLSA
by insulating them from the ECFA's reach.[10]

          Plaintiffs also argue they should be compensated for
their time commuting because they were subject to Defendants'
strict rules when operating their FDNY vehicles.   Plaintiffs
were only permitted to use their vehicles for official FDNY
business, could not make any personal stops during their
commutes, and were not allowed to transport passengers.
Accordingly, Plaintiffs claim they were under Defendants' full
control while operating their vehicles and thus should be
compensated.   But this argument is a non-starter because

---

[9] This notion is belied by the fact that both Colella and Cermak
switched to Option 2 after initially signing Driver Election
Forms electing Option 1, and neither of them was fired for doing
so.

[10] Further, although Plaintiffs allege Defendants would assign
any trades personnel who did not elect Option 1 to far away work
locations, there is no evidence that those locations were not
within the FDNY's normal commuting area, i.e., the five
boroughs.   Accordingly, this type of allegation does not
undermine either of the requisites for applying the ECFA to the
facts of this case.

Plaintiffs fail to cite any authority or even to explain why such restrictions should alter the analysis under the ECFA.  At the same time, case law holds that the exact types of restrictions decried by Plaintiffs are permissible.  <u>Chambers v. Sears Roebuck & Co.</u>, 428 F. App'x 400, 411-13 (5th Cir. 2011) ("Nothing in the statutory scheme requires, or even implies, that such conditions on an employee's use of a company car, including the transportation of parts or tools, can transform an otherwise non-compensable commute into a compensable one."); <u>Rutti</u>, 596 F.3d at 1052-54.  The Court agrees that Defendants' restrictions on the use of their company vehicles does not affect their ability to claim exemption under the ECFA.[11]

The closest Plaintiffs come to raising a genuine dispute of material fact as to whether their travel did not constitute non-compensable commuting under the ECFA is the allegation that they drove difficult and dangerous vehicles, which are not normally used for commuting purposes.  When it enacted the ECFA, Congress considered including language that would have "requir[ed] that vehicles used for commuting purposes be of a type that does not impose substantially greater

---

[11] Defendants' restrictions make sense as a practical matter. Because Defendants pay for all gas and toll charges associated with their vehicles, they should not be required to pay for Plaintiffs' personal use of the same vehicles.  And Defendants may have legitimate liability concerns for prohibiting passengers in their vehicles.

difficulties to drive than the type of vehicle that is normally used by employees for commuting."  H.R. Rep. No. 104-585, at 13. However, as enacted, the Minority View pointed out that "[t]he plain language of [the statute] . . . includes no limitation whatsoever on what kind of vehicle may be used for commuting purposes."  Id.  The Committee Statement on this issue explained:

> To be considered noncompensable travel time, the courts and the Department of Labor have generally considered that driving a company vehicle be similar to commuting in a private vehicle.  The fact that a vehicle may have been modified for special purposes, displays company logos, or is specially equipped does not alter the nature of such travel.

Id.  Thus, it would appear that Congress deferred to the Department of Labor to clarify this question, which it did in 2001 when it issued an important Opinion Letter.

In its Opinion Letter, the Department of Labor drew a distinction between mini vans, vans, and pick-up trucks——which may be used for commuting purposes, "even if modified to carry tools or equipment"——and construction vehicles such as "18-wheelers," truck-mounted cranes, truck-mounted drilling rigs, and concrete trucks——which are substantially different from commuting vehicles.  FLSA2001-11, 2001 DOLWH LEXIS 6 (Apr. 18, 2001).  Here, Plaintiffs drove either vans or box utility trucks, neither of which falls into the "substantially

different" category.  Indeed, no special driver's license was required in order to operate these vehicles.  And although they may have been more difficult to operate than a sedan, for example, the fact that they had FDNY logos and warnings on the back to "keep back 200 feet," (Waters Decl. Ex. L, at V0061), could only have eased Plaintiffs' driving conditions.

The Department of Labor's Opinion Letter also contemplates that "if the employee is required to drive a different route than normally used for commuting (due to such vehicular restrictions as weight allowances on bridges, size allowances in tunnels, or chemicals transported), we would consider the vehicle to impose substantially greater difficulties to operate than a vehicle normally used for commuting."  2001 DOLWH LEXIS 6.  Although Plaintiffs say they were forced to transport dangerous materials, most of the items alleged to be dangerous are ordinary products such as batteries, cleaning supplies, gasoline, and propane.[12]  Plaintiffs ensured these items were secured before driving, and although they had to stop at times to re-secure items, no Plaintiff testified that any accident occurred, let alone one involving dangerous chemicals.  More importantly, Plaintiffs claim they were

---

[12] Only Cermak transported something that requires expertise to handle properly:  acetylene.  However, he testified that he had not transported it since 2008, and even before then it was only on and off.  (Waters Decl. Ex. EE, at 61-62.)

permitted to drive their FDNY vehicles on any road; there were
no restrictions based on the vehicles they drove or the
materials they transported.  (See Pl. 56.1 ¶ 333 & n.2.)  The
Court, therefore, finds nothing so extraordinary about the
materials that Plaintiffs transported in their FDNY vehicles or
the vehicles themselves so as to make Plaintiffs' commute time
compensable.[13]

        Plaintiffs make one final plea to have their commute
time be deemed outside the scope of the ECFA's exemption.  They
argue that Defendants had a custom and practice in place that
compensated employees for the exact type of travel for which
they have denied Plaintiffs overtime pay and point to the
"compensability by contract or custom" clause of the PPA, which
provides:

> Notwithstanding the provisions of subsection
> (a) of this section which relieve an
> employer from liability and punishment with
> respect to any activity, the employer shall
> not be so relieved if such activity is
> compensable by either——
>
>> (1) an express provision of a written
>> or nonwritten contract in effect, at
>> the time of such activity, between such
>> employee, his agent, or collective-
>> bargaining representative and his

---

[13] The Court also does not find that the duration of Plaintiffs'
commutes increased as a result of electing Option 1.  In fact,
Plaintiffs themselves say just the opposite:  "Plaintiffs were
punished [for not choosing Option 1] by being compelled to drive
their personal vehicle long distances and longer hours on the
road to work sites furthest from their homes, and for longer
durations . . . ."  (Pl. 56.1 ¶ 32.)

> employer; or (2) a custom or practice
> in effect, at the time of such
> activity, at the establishment or other
> place where such employee is employed,
> covering such activity, <u>not
> inconsistent with a written or
> nonwritten contract, in effect at the
> time of such activity</u>, between such
> employee, his agent, or collective-
> bargaining representative and his
> employer.

29 U.S.C. § 254(b) (emphasis added).  As the emphasized text

shows, section 254(b) is inapplicable on the facts of this case

because even assuming Defendants had a custom or practice in

effect that compensated trades personnel for driving their FDNY

vehicles, that custom or practice is inconsistent with the

signed Driver Election Forms.  "[T]he intent of [section 254(b)]

is that a custom or practice which is inconsistent with the

terms of any . . . contract shall not be taken into account in

determining whether such an activity is compensable."  29 C.F.R.

§ 790.10(f).  Moreover, the custom and practice Plaintiffs

highlight dealt with compensating trades personnel for the time

spent driving their FDNY vehicles between central pick-up/drop-

off locations and their worksites, which Defendants maintained

for any employee who elected Option 2 on the Driver Election

Form.  Plaintiffs do not allege that Defendants ever had a

custom and practice of compensating trades personnel for home-

to-work travel.  Accordingly, Plaintiffs' apple-to-oranges

comparison fails.

For the foregoing reasons the Court finds as a matter of law that the time Plaintiffs spent traveling in Defendants' vehicles between their homes and work locations constitutes non-compensable commuting time under the ECFA, and the Court therefore dismisses these claims.  The reality for Plaintiffs is that Congress, in enacting the ECFA, provided Defendants a "vehicle" to realize cost-savings by having Plaintiffs transport their own tools and equipment rather than employing separate motor vehicle operators to perform that sole task.  Reasonable minds might disagree as to the wisdom of that policy decision, but its legality is not in dispute:  the ECFA strictly permits it.

> 3.   Plaintiffs' Remaining Activities Are Incidental to Their Commutes, De Minimis, and Thus Non-Compensable

Plaintiffs also seek overtime pay for the time spent transporting tools and equipment in their vehicles, inspecting their vehicles, stopping to secure items that shifted during their commutes, and speaking with their supervisors about scheduling matters while commuting between their homes and work locations.  None of these activities, however, constitutes compensable work under the FLSA.  Moreover, to the extent any of these activities might be compensable, Plaintiffs may not prevail on these claims because the activities are de minimis.

The legislative history for the ECFA provides helpful guidance for determining whether activities are non-compensable because they are incidental, preliminary, or postliminary to exempt commute time:

> Activities which are merely incidental to the use of an employer-provided vehicle for commuting at the beginning and end of the workday are similarly not considered part of the employee's principal activity or activities and therefore need not be compensable.  It is not possible to define in all circumstances what specific tasks and activities would be considered "incidental" to the use of an employer's vehicle for commuting.  Communication between the employee and employer to receive assignments or instructions or to transmit advice on work progress or completion, is required in order for these programs to exist. Likewise, routine vehicle safety inspections or other minor tasks have long been considered preliminary or postliminary activities and are therefore not compensable.  Merely transporting tools or supplies should not change the noncompensable nature of travel.

H.R. Rep. No. 104-585, at 5 (emphasis added).  Here, the Court finds that all the extra activities Plaintiffs conducted are incidental, preliminary, or postliminary to their commutes, in line with the legislative history cited above and substantial case law.  See, e.g., Chambers, 428 F. App'x at 420 n.55 ("[R]efueling the service van, performing vehicle safety inspections, and tidying up the van . . . . are [activities] clearly incidental to the commute under the ECFA and thus non-compensable."); Rutti, 596 F.3d at 1057 ("Rutti's morning

activities do not appear to be integral to his principal
activities.  Most of his activities——receiving, mapping, and
prioritizing jobs and routes for assignment——are related to his
commute." (internal quotation marks omitted)); Aiken v. City of
Memphis, 190 F.3d 753, 758-59 (6th Cir. 1999); Buzek v. Pepsi
Bottling Group, Inc., 501 F.Supp.2d 876 (S.D. Tex. 2007)
(holding as non-compensable pursuant to the ECFA electrician's
time spent transporting his necessary tools in his employer's
vehicle from home-to-work and calling his supervisor and
uploading reports from home).  Conversely, the cases Plaintiffs
cite are inapplicable because they either precede the enactment
of the ECFA or do not involve the type of home-to-work travel
that triggers the ECFA's application.

          Furthermore, the amount of time Plaintiffs spent
performing these additional activities is de minimis.  The
Supreme Court has held that "[i]t is only when an employee is
required to give up a substantial measure of his time and effort
that compensable working time is involved." Anderson v. Mt.
Clemens Pottery Co., 328 U.S. 680, 692 (1946).  The Court of
Appeals has identified three factors for determining whether
otherwise compensable time should be deemed de minimis:  (1) the
practical administrative difficulty of recording the additional
time; (2) the size of the claim in the aggregate; and (3)
whether the claimants performed the work on a regular basis.

Reich, 45 F.3d at 352.   In Reich, police officers sought pay for the time spent caring for their canines during their commutes. Applying the three-factor test, the court found such activities to be de minimis:

> While handlers testified that they were required to restrain their dogs when they barked or misbehaved, it does not appear that such behavior occurred frequently or lasted for a significant time. . . . Similarly, the cases in which the dogs vomited or soiled their handlers' cars, or required a stop to be walked, were few and far between.   Stops for water were more frequent in the heat of summer, but consumed only a few minutes.   Considered in the aggregate, the time spent by handlers in dog-care duties during the commute was neither substantial, nor regularly occurring.   For a number of reasons, furthermore, it would be administratively difficult for the [defendant] to monitor and record the time expended by handlers in dog-care duties during the commute.   The task of recording the time spent in such duties, when they arise, might well exceed the time expended in performance of the duties. Considering the administrative difficulty of establishing a reliable system for recording the time spent in such care during commutes, the irregularity of the occurrence, and the tiny amount of aggregate time so expended, we conclude that these episodes of additional compensable work are de minimis and, therefore, need not be compensated.

Id. at 652-53.

    The same conclusion with respect to Plaintiffs' activities is warranted here.   The only activity Plaintiffs claim to have conducted frequently was an inspection of their

vehicles.  But those inspections varied greatly in duration,
ranging from four minutes to thirty minutes.  As for the time
spent securing items that shifted during their commutes,
Plaintiffs testified they were required to re-secure items
anywhere from twice, to once in a while, to a handful of times,
to once a month, to two times per week, with each stop lasting
from 5-20 minutes.  Plaintiffs gave a similar range of answers
when asked how often and for how long they were required to
speak with their supervisors during their commutes.  Because all
these activities occurred away from Defendants' worksites——
indeed, most took place on the road——it would be
administratively difficult to create a system for accurately
recording the time Plaintiffs spent performing them.  Plaintiffs
also performed these activities infrequently.  Accordingly, in
line with Reich, the Court finds that the time Plaintiffs
devoted to inspecting and securing their vehicles and
communicating with their supervisors during their commutes was
de minimis, and thus the Court dismisses these claims for this
additional reason.

        Having concluded that Plaintiffs were not denied
overtime pay in violation of the FLSA, the Court reiterates what
it was tasked with determining in this litigation.  Whatever the
merits may be of Plaintiffs' claims that Defendants tricked them
into signing the wrong Driver Election Forms or forced them to

elect options they did not agree with, purportedly in violation of established collective bargaining procedures, those claims were not before this Court.  The question for this Court, rather, was whether the activities for which Plaintiffs claim overtime pay were compensable under the FLSA, regardless of how Plaintiffs came to perform those activities.  Because the Court concludes as a matter of law that the FLSA does not recognize such activities as compensable work, Plaintiffs claims must fail, and the Court need not——indeed, it does not——express an opinion regarding Defendants' alleged bad faith bargaining.

### 4.   Plaintiffs' "Failure to Record" Claim Also Fails

Defendants were required to maintain adequate records of the time Plaintiffs spent performing compensable work.  See 29 U.S.C. § 211(c); 29 C.F.R. § 516.2.  Had they not, and had this Court found that Plaintiffs were entitled to overtime pay for which they had not been compensated, Plaintiffs' failure to maintain adequate records could have resulted in an approximation of Plaintiffs' damages.  See Martin v. Selker Bros., 949 F.2d 1286, 1296-97 (3d Cir. 1991).  But because the Court finds that Defendants did not improperly withhold overtime pay from Plaintiffs, there can be no violation of the FLSA's record keeping provisions.  In other words, Defendants were not required to track Plaintiffs' non-compensable commuting time.

Accordingly, the Court dismisses Plaintiffs' second cause of action.


III. <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment [Dkt. No. 61] is GRANTED.

SO ORDERED.


DATED:      New York, New York
            December 5, 2013

_____
UNITED STATES DISTRICT JUDGE